## CIRCUIT COURT OF SPOTSYLVANIA COUNTY

Joey Keller et al.

v.

James Woods et al.

March 22, 1995

Case No. L93-415

BY JUDGE WILLIAM H. LEDBETTER, JR.

The remaining issue in this case is whether the plaintiffs are entitled to recover under the Business Opportunity Sales Act.

### Facts

This case was tried without a jury on March 14, 1995. The pertinent facts presented at trial are as follows.

Pioneer Potato Co., Inc., an Arizona corporation (the Company), makes and distributes a beverage concentrate for use in connection with the sale of shaved ices under the trademark and service mark "Tropical Sno." The Company grants exclusive rights to the distribution of the product and use of the mark and logo to territorial distributors across the country.

George Conley of Chesapeake, Virginia, operating as Conley Tropical Sno, Inc., has the exclusive distributorship for a geographical area that includes Spotsylvania County. In 1989, he sold an exclusive distributorship sublicense to James Woods and Janice Woods, authorizing them to establish retail sales locations and/or create subdistributorships within Spotsylvania County. The Woods created J & J Tropical Sno, Inc.

In June, 1991, the Woods opened a kiosk for the retail sale of shaved ice at Pharmhouse Store, a discount store located in Spotsylvania County. They ran the business through March, 1992.

Some time in early 1992, Joey Keller and Janice Keller approached the Woods about a Tropical Sno dealership. Eventually, talk turned to the Pharmhouse operation. The Kellers agreed to purchase the Pharmhouse location distributorship from the Woods for $22,000.00. On March 31, 1992, the parties signed a "dealer agreement." Pl. Ex. # 3.

The Kellers assumed ownership and control of the Pharmhouse kiosk and operated a business there from April, 1992, until the first part of December, 1992. Because their volume of business was less than anticipated, they asked the Woods to buy it back or find a buyer for them. Within a few weeks, the Kellers sold the Pharmhouse kiosk operation for $8,000.00 to someone introduced to them by the Woods.

The Kellers commenced this action on November 23, 1993, alleging fraud and violations of the Business Opportunity Sales Act. The Woods filed responsive pleadings. Conley, originally joined as a defendant, was nonsuited prior to trial.

After hearing the evidence and arguments at the bench trial, the Court ruled that the Kellers had not established common law fraud by clear and convincing evidence and found in favor of the Woods under Count I (the fraud claim) for reasons stated on the record and took under advisement the Kellers' claim under the Business Opportunity Sales Act. This opinion letter addresses the Kellers' claim under that Act.

A "business opportunity" means the sale of any products, equipment, supplies, or services which are sold to a purchaser for the purpose of enabling such purchaser to start a business and in which the seller makes certain representations or guarantees. Pertinent here, a "business opportunity" includes such a sale if the seller represents that the seller will provide locations or assist the purchaser in finding locations for the use or operation of racks, display cases, or other similar devices, on premises neither owned nor leased by the purchaser or seller. Virginia Code § 59.1-263(A).

The Act contains a number of exclusions, such as the sale of securities, franchises, and on-going businesses. An "on-going" business is defined as a business that has been in operation at a specific location for at least twelve months prior to the sale. Also excluded is a "license granted by a general merchandise retailer" that allows the purchasers to sell products under the seller's trade name or mark, provided that the general merchandise retailer has operated in Virginia for five years and also sells the same products to the general public. Finally, there is an exclusion for any agreement "by which a retailer grants to another the right to sell goods or

services within or appurtenant to a retail business establishment as a department or division thereof." Section 59.1-263(B).

When a transaction is within the purview of the Act, the seller must make certain written disclosures to the purchaser. Section 59.1-265. Under certain circumstances, the seller is required to obtain a surety bond in an amount not less than $50,000.00. Section 59.1-265. Certain acts are expressly prohibited, including "representations that the business opportunity provides income or earning potential of any kind" unless the seller also substantiates those representations by documents delivered to the purchaser at the time the claims of income or earning potential are made. Section 59.1-266. All contracts for the sale of business opportunities must be in writing and must include certain provisions specified in the Act. Section 59.1-267.

The threshold question is whether the Woods-Keller transaction constitutes a "business opportunity" within the meaning of the Act. The Court holds that it does.

The Tropical Sno distributorship scheme is at least as much concerned with selling subparts of "exclusive dealership" territories as it is with actual retail sales. For example, the Woods have exclusive rights to Tropical Sno in Spotsylvania County and the City of Fredericksburg. They assigned (sold) that exclusive right, limited to one specific location, to the Kellers, along with inventory and equipment, for $22,000.00. That leaves as many other specific locations in this area for which an exclusive subdistributorship can be sold as the market will bear. This is the sort of business opportunity sale that the Act is intended to regulate. None of the statutory exclusions apply.

From the evidence presented, it is obvious that the Woods did not comply with the Act. For example, many of the disclosures required in § 59.1-264 were not made, and the contract, while in writing, did not contain all the terms required by § 59.1-267.

The Woods contend that Virginia's Business Opportunity Sales Act does not apply to this transaction because the parties' contract says that it is governed by the law of Utah. That argument is without merit. The Act is intended to regulate a particular type of sale that is susceptible to abuse and overreaching.

If the seller of a business opportunity could avoid the Act by the simple expedient of providing in the contract that another state's law applies, every such seller could designate a state that has no such legislation, or more lenient legislation, thereby eviscerating Virginia's effort to regulate

these transactions within its borders. In this case, the Woods are residents of Virginia, the Kellers are residents of Virginia, the transaction took place in Virginia, and the location of the subdistributorship was in Virginia. Therefore, the Act applies.

Even though this transaction is covered by the Act, the question remains whether the Kellers are entitled to recover damages under it.

If the seller of a business opportunity fails to comply with the requirements of the Act, the purchaser may *void the contract* within one year. Section 59.1-268. The Court construes this statutory remedy to give the purchaser of a business opportunity the absolute right to void his contract within one year and recover his money if the transaction violates the Act. In other words, the seller of a business opportunity who does not comply with the requirements of the Act risks the complete avoidance of the contract if the purchaser acts within one year of the date of the contract.

That was not done here. The Kellers have made no attempt to void the contract. Their pleadings do not purport to enforce this provision of the Act. Instead, this is a civil action for recovery of damages. They contend that they have been damaged by misrepresentations made by the Woods, and they claim that their damages are measured by the difference between what they paid for the business opportunity ($22,000.00) and the amount for which they sold it ($8,000.00).

In order to recover damages, the Kellers must prove that they have been *injured by a violation* of the Act. Section 59.1-268. They have failed to do that.

The representations about which the Kellers complain are the statements made by the Woods regarding the projected volume of sales and the renewability of the Pharmhouse lease.

According to the Kellers' evidence, the Woods told them that they could expect gross sales of $96,000.00 to $115,000.00 a year at the Pharmhouse location. Pl. Ex. # 2. The Woods shared their 1991 Sub S Corporation income tax return with the Kellers. That return indicates gross receipts of $59,000.00 from the retail sales of "sno cones." Apparently, however, that figure includes revenue from sources other than the Woods' sales of shaved ice at the Pharmhouse location. Pl. Ex. # 9. The Kellers contend that those representations were false and that they were misled by the representations.

The Woods' evidence is that the "$96,000.00 to $115,000.00" written on Pl. Ex. # 2 was Mr. Woods' projection of what the Woods anticipated sales to be if they continued their operation of the kiosk at Pharmhouse. He

denied that he attempted to project for the Kellers what *they* could earn at that location. Nevertheless, the Court finds that any such representation would be a statement of "earning potential" and should be accompanied by documented data to support it. Mr. Woods testified that he did just that. He points out that Pl. Ex. # 8 is the daily log or ledger of sales at the Pharmhouse location during the entire period the Woods operated the kiosk. He explained that this log was available to the Kellers when they were at his kitchen table discussing the transaction, although Mr. Keller denied seeing it. He also explained that he made further efforts to share all relevant data with the Kellers by giving them the name, address, and telephone number of his accountant. See Pl. Ex. # 2.

To someone with little or no business experience and little or no knowledge of bookkeeping or accounting principles, the comment by Mr. Woods about his projected gross sales and the Sub S Corporation tax return might be misleading or at least confusing. Here, however, the representation about projected gross sales and the disclosure of the tax return were not made in a vacuum. The Kellers had the opportunity to examine the tax return and ask questions about it. (Its completeness and accuracy are not challenged.) They were invited to contact the Woods' accountant. And, most significantly, the sales log itself was available for the Kellers' review. Mr. Keller has had training in bookkeeping and accounting. His reliance upon the tax return and Mr. Woods' comment about projected sales is quite different from one who has no such training and experience, especially in light of the availability of the sales log and access to the Woods' accountant.

For these reasons, the Court concludes that the Woods made no material false representations upon which the Kellers relied to their detriment.

Further, the Kellers have failed to establish that the loss or damage they complain about was caused by or attributable to anything the Woods said or did. During the time the Kellers operated the kiosk at Pharmhouse (April, 1992, through the first part of December, 1992), they generated about $33,000.00 in gross sales. During the time the Woods operated the kiosk at Pharmhouse (June, 1991, through March, 1992), they took in only around $47,000.00, a fact that was known to the Kellers or available to them when they signed the contract. Both of these experiences, of course, fall short of the $96,000.00 to $115,000.00 range mentioned by Mr. Woods. For the reasons explained, however, that projection was not a material misrepresentation, given the other data available to the Kellers and given the experience and training of Mr. Keller.

Why the Kellers sold no more shaved ice (and other products) at the Pharmhouse than they did is left to speculation. Were their hours of operation the same as the Woods' hours? Were their employees as adept at promotions and sales? Did they maintain the appearance, e.g., attractiveness and cleanliness, of the kiosk and the equipment? Were their products of as good a quality as those sold by the Woods? Did they maintain a full inventory of products? These matters were not addressed although it is common knowledge that such variables can have considerable impact upon gross sales. The Kellers did not establish by a preponderance of the evidence that they suffered injury as a result of a violation of the Act.

Accordingly, the Court finds for the defendants.